A04A2047. DAVIS v. CARTER MECHANICAL, INC.
(612 SE2d 879)

ADAMS, Judge.

William Davis, Jr. was injured on January 16, 1998, in the course of his employment with Carter Mechanical, Inc., when a large steel platform fell on his right leg. He sought to have his injury designated as "catastrophic" under the applicable provision of the Workers' Compensation Act, OCGA § 34-9-200.1 (g) (6). The administrative law judge found that Davis's injury was catastrophic as defined under the Act, but the appellate division of the State Board of Workers' Compensation reversed that finding. The superior court affirmed. We granted Davis's discretionary appeal to address the issue of catastrophic injury under the Act.

Davis sought to prove that his injury is "catastrophic" by showing that it is "of [such] a nature and severity that prevents the employee from being able to perform his or her prior work and any work available in substantial numbers within the national economy for which such employee is otherwise qualified." OCGA § 34-9-200.1 (g) (6). There is no dispute that Davis is unable to perform his prior job. Accordingly, the only issue is whether there is any work available in substantial numbers within the national economy for which Davis is otherwise qualified.

Davis's work experience involved jobs requiring physical labor that he can no longer perform. His medical treatment included two

operations on his knee. The last report furnished by Davis's doctor, dated October 27, 2001, imposed restrictions upon his lifting in excess of 50 pounds and upon excessive bending, stooping and squatting. The doctor recommended that he perform only sedentary work, which involves lifting up to ten pounds.

Davis's Functional Capacity Evaluation ("FCE"), dated April 4, 2002, shows his safe maximum work capacity within the medium to medium/heavy range, which entails no heavy lifting over 50 pounds. The FCE also recommended that he change position from standing to sitting every 30 minutes. Although the FCE lists some restrictions on kneeling, crawling, climbing and repetitive squatting, it does not specifically list any restrictions upon bending. On May 1, 2002, Davis's doctor signed a letter indicating that he agreed with the restrictions listed in the FCE.

Davis's vocational expert, William Thompson, testified at the hearing before the ALJ that he had interviewed Davis, reviewed his medical records, reviewed the FCE, performed a vocational assessment and conducted several tests to measure Davis's achievement, intellectual aptitudes, educational level and temperament. In addition to the physical restrictions listed in the medical reports and FCE, Thompson's tests indicated that Davis's reading comprehension is at a fourth-grade level and his vocabulary is at a seventh-grade level. He spells at a third-grade level, and functions at a high school level in math. His IQ score of 87 places him in the average range of intelligence. Davis graduated high school out of the special education curriculum.

Based upon these factors, Thompson testified that Davis would have trouble filling out a job application because he cannot read or write well. He said that Davis would need help in reading about job opportunities or filling out job applications. Further, he "may find it difficult to succeed in any job that called for salesmanship, supervising others, communication skills, managerial skills, public relations skills, and interviewing skills." It was Thompson's opinion that no work was available in substantial numbers within the national economy for which Davis was qualified given his limitations.

Carl Dye, the vocational expert for Carter Mechanical, testified that he had prepared a labor market survey and a list of jobs reflecting a substantial number of jobs available in the national economy that Davis was capable of performing. In preparing these reports, Dye relied primarily upon Davis's medical reports, his deposition testimony and the FCE, and he took into consideration Davis's age, occupation, training and limitations as defined in those documents. Specifically, he understood that Davis's restrictions were for medium to light-heavy work, lifting up to 50 pounds and no kneeling, crouching or climbing. Dye relied upon the evaluation in the FCE that

Davis could stand from 64 to 100 percent of the work day. He did not believe that the recommendation that Davis alternate sitting and standing during the day removed Davis from the medium to light-heavy restriction.

In preparing his analysis for the case, Dye searched for entry level jobs, with some on-the-job training, in the light, sedentary-light or medium work categories, taking into account Davis's age, occupation, training and limitations. He determined that the jobs he located, including positions for cashiers, security guards and information clerks, were available in substantial numbers in the national economy, but clarified that when he used the word "available," he meant that the jobs exist, not that they represent job openings. Dye stated that he believed Davis was capable of performing these jobs, and he assumed that Davis could perform the full range of essential functions for the positions. Just prior to the hearing, Dye updated his analysis to identify jobs available in the local area that fit Davis's criteria, and he noted two or three such jobs.

The ALJ concluded that Davis's injury was catastrophic based upon her finding that "Davis' employment prospects are limited to jobs which are specifically tailored to his situation, and these types of situations are not found in the general economy in significant numbers." Carter Mechanical appealed that portion of the ALJ's award. In reversing the ALJ, the State Board found that, despite having suffered a permanent debilitating knee injury, the injury was not of such a nature and severity as to prevent him from performing work available in substantial numbers within the national economy for which he is otherwise qualified. Although Davis had significant restrictions in connection with his injury, the Board found that he was capable of light duty work. Accordingly, the State Board concluded that his injury was not catastrophic, and Davis appealed that finding to the superior court.

The superior court affirmed the award applying the "any evidence" standard. See *High Voltage Vending v. Odom*, 266 Ga. App. 537 (597 SE2d 428) (2004). This Court is bound by the same evidentiary standard and must construe the evidence in the light most favorable to the party prevailing before the State Board. Id. "It is axiomatic that the findings of the State Board of Workers' Compensation, when supported by any evidence, are conclusive and binding, and that neither the superior court nor this court has any authority to substitute itself as a fact finding body in lieu of the Board." (Punctuation and footnote omitted.) *Jered Indus. v. Pearson*, 261 Ga. App. 373 (582 SE2d 522) (2003). Accordingly, we must determine whether the record contains any evidence to support the State Board's conclusions.

1. Davis contends that the evidence was insufficient to support the Board's conclusions because Dye's testimony did not properly address the requirements of OCGA § 34-9-200.1 (g) (6). Davis notes that Dye testified only that a substantial number of jobs "exist" in the economy, not that such jobs are "available" as required by the language of the statute. He apparently argues that the statutory language requires not just proof of existing jobs, but rather proof of a substantial number of job openings for which the claimant is otherwise qualified. Davis also asserts that Dye's testimony was insufficient because he never testified that a substantial number of jobs are available in the national economy *for which Davis is otherwise qualified,* as required by the statute.

This Court previously has noted that OCGA § 34-9-200.1 (g) (6) was amended in 1995 in an effort "to eliminate the confusion which had arisen in applying Social Security findings to state workers' compensation proceedings." (Citation omitted.) *Cobb County School Dist. v. Barker,* 271 Ga. 35, n. 1 (518 SE2d 126) (1999). Thus, the General Assembly changed the Act's definition of "catastrophic injury" to adopt language similar to that employed by the Social Security Administration ("SSA") in determining the availability of disability benefits. Id. To qualify for disability under Social Security requires that a person be

> not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which *exists* in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

(Emphasis supplied.) 42 USC § 423 (d) (2) (A).[1]

Although the Georgia legislature adopted somewhat different language from that in the federal statute, it is apparent that the amendment was an effort to bring the two provisions in line. In fact, the May 20, 2004 Report of the Governor's Workers' Compensation Review Commission indicates that this amendment "incorporates the definition of total disability used in the federal Social Security

---

[1] We note that this amendment made the award of Social Security benefits an evidentiary matter to be considered when deciding whether an injury was "catastrophic" under the Georgia Act, although it explicitly provides that no presumption arises from the grant or denial of such benefits. *Cobb County School Dist. v. Barker,* 271 Ga. at 35, n. 1; OCGA § 34-9-200.1 (g) (6). Here, the record is silent as to whether Davis is qualified for or has been awarded disability benefits by the SSA.

system." (Footnote omitted.) Thomas A. Eaton and David B. Mustard, Report of the Governor's Workers' Compensation Review Commission, 38 Ga. L. Rev. 1241, 1308-1309 (VIII) (a) (2004). See also Kimberly A. Stout, Labor and Industrial Relations, 12 Ga. St. U. L. Rev. 280, 287 (1995). Accordingly, we find that the legislature's use of the term "availability" was not intended to require a showing beyond proof that work *exists* in substantial numbers within the national economy.

And while Dye's testimony may not have tracked the precise language of the statute by stating that work was available in substantial numbers within the national economy for which Davis was "otherwise qualified," he did testify that Davis was capable of performing the jobs included in his report given his physical restrictions.

We find, therefore, Dye's testimony was not incompetent on the ground that he failed to testify regarding the proper statutory standards.

2. Davis also argues that Dye did not consider all of the appropriate factors in identifying jobs for which he was qualified.[2] He notes that Dye did not interview him or conduct any independent tests. He asserts that Dye failed to properly consider his reading, spelling or vocabulary levels and did not take into account that he had been a special education student, even though Dye conceded that Davis's level of reading ability and his ability to write would affect his ability to compete in the job market and should be taken into consideration. Nor did Dye's report take into account Davis's restrictions on bending, although Dye conceded that such a restriction could be significant. Davis contends that Dye's report and testimony were not competent evidence because they did not adequately consider these limitations.

While Dye did not take into account all of the individual limitations identified by Thompson, we find that this discrepancy goes to the weight to be accorded Dye's report and not to the competence of that evidence. See generally *Popham v. Popham*, 278 Ga. 852, 853 (3) (607 SE2d 575) (2005) (the facts upon which an expert bases his opinion go to the weight to be given the testimony); *J. B. Hunt*

---

[2] We note that the United States Supreme Court has held that consideration of the comparable federal provision requires an assessment of an individual's abilities in order to determine whether jobs exist that a person having the individual's qualifications could perform. *Heckler v. Campbell*, 461 U. S. 458, 460-461 (103 SC 1952, 76 LE2d 66) (1983). This would include consideration of the individual's "physical ability, age, education, and work experience." (Citations and footnote omitted.) Id. at 460 (I). And the Court has acknowledged that "inquiry into whether the claimant's cumulative impairments preclude him from finding 'other' work is very difficult, requiring consideration of each of the vocational factors[,] and an individual assessment of each claimant's abilities and limitations." (Citations and punctuation omitted.) *Barnhart v. Thomas*, 540 U. S. 20, 28 (II) (124 SC 376, 157 LE2d 333) (2003).

*Transport v. Brown*, 236 Ga. App. 634 (1) (512 SE2d 34) (1999). The State Board had the medical reports, the FCE and Thompson's evaluations, and it was within the province of the Board to determine whether the experts had considered the appropriate factors.

Although Dye did not consider the specific results of Thompson's tests in performing his analysis, he did take into account Davis's aptitude for training. Dye testified that he relies upon a claimant's prior educational and work history to draw conclusions about his capabilities and temperament for training. And Davis testified that after he graduated from high school, he took several months of welding classes at Macon Tech. He also completed a five-year apprenticeship program as a millwright through his union, which required weekly classes, training and a performance test. Davis acknowledged that his prior work history required him to use mathematics, to operate calibrating machines and to utilize isolated drawings from blueprints.

And even though Dye's analysis did not consider any restrictions on bending, the FCE did not specifically outline such a restriction. While Davis's doctor had imposed a bending restriction in October 2001, six months later, the doctor affirmed the FCE's list of work restrictions despite this omission.

The State Board could have relied upon this evidence to conclude that Dye considered the necessary factors in preparing his report.

3. Davis also asserts that Dye improperly considered accommodated jobs in his analysis, which Davis contends are not relevant to show that work is available in substantial numbers.

Given the similarity between the Social Security provision and OCGA § 34-9-200.1 (g) (6), federal case law and SSA policy may be instructive on this issue. The federal courts have determined that the SSA does not consider accommodated jobs to be relevant in determining whether to award disability benefits, unless there is proof that such jobs exist in substantial numbers in the national economy. Thus, in analyzing whether an individual is capable of performing his previous job, the SSA does not consider whether the individual would be able to perform that job given necessary accommodation from the employer. Rather, "[a] finding of ability to do past relevant work is only appropriate if the claimant retains the capacity to perform either the actual functional demands and job duties of the particular past relevant job . . . or the functional demands and job duties of the occupation as generally required . . . throughout the national economy." (Citation omitted.) *Swanks v. Washington Metro. Area Transit Auth.*, 116 F3d 582, 585 (II) (D.C. Cir. 1997).

And in considering whether the claimant qualifies for "jobs that exist in significant numbers in the national economy," " '(i)solated jobs that exist only in very limited numbers' are not sufficient to

demonstrate that a claimant can do 'other work.' " (Citations omitted.) *Swanks v. Washington Metro. Area Transit Auth.*, 116 F3d at 585. Accordingly, the SSA has determined that whether the employer might be willing to alter job duties to suit the limitations of a specific claimant is not relevant. Rather, that determination is "based on the functional demands and duties of jobs as ordinarily required by employers throughout the national economy, and not on what may be isolated variations in job demands. . . ." (Citations omitted.) Id. Thus, "[t]o support a . . . finding that an individual can perform 'other work,' the evidence . . . would have to show that a job, which is within the individual's capacity because of employer modifications, is representative of a significant number of other such jobs in the national economy." (Citations omitted.) Id.

Dye's testimony conflicted with this standard to some extent in that he stated that "if a particular job that is otherwise available in the national economy is modified to accommodate the specific limitations, restrictions of a given individual, that the job, the modified job, is still available in a significant number in the national economy." But the Board could have found that this testimony was in the context of a general discussion of accommodation, and that Dye never conceded that any of the jobs in his analysis would require accommodation of Davis's restrictions in order for Davis to perform them. To the contrary, he testified that Davis was capable of performing these jobs even considering his restrictions. Thus, his testimony would comply with SSA policy, and we see no reason to apply a different standard in analyzing the testimony under the Georgia Act.

Accordingly, based upon our review of the record, we find that there was sufficient evidence to support the State Board's conclusion that Davis was capable of performing light work, and thus that his injury was not catastrophic under Georgia law.

*Judgment affirmed. Ruffin, C. J., and Bernes, J., concur.*

DECIDED MARCH 30, 2005 —
RECONSIDERATION DENIED APRIL 13, 2005.

*Westmoreland, Patterson & Moseley, Thomas W. Herman*, for appellant.

*Carlock, Copeland, Semler & Stair, Christopher A. Whitlock, Kelly M. Clark*, for appellee.